UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL A. DIPONIO,

     Plaintiff,

                                         Case No. 21-cv-11499

v.                                       Hon. Matthew F. Leitman

DENIS MCGUCKIN, *et al.*,

     Defendants.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 38)

On June 25, 2018, Defendant Denis McGuckin, a trooper and canine handler with the Michigan State Police, conducted a traffic stop of a vehicle driven by Plaintiff Paul A. DiPonio. During that stop, McGuckin found suspected methamphetamine in DiPonio's car.

In this action, DiPonio claims that McGuckin violated his constitutional rights in several respects in connection with the traffic stop. (*See* Am. Compl., ECF No. 6.) McGuckin has now moved for summary judgment. (*See* Mot., ECF No. 38.) The Court held a hearing on the motion on July 23, 2024. For the reasons explained below, McGuckin's motion is **GRANTED**.

**I**

**A**

On June 25, 2018, McGuckin was on patrol in his canine patrol vehicle in Flint, Michigan when he received a call from an agent with the United States Drug and Enforcement Agency (the "DEA"). (*See* McGuckin Dep at 33, ECF No. 38-3, PageID.414.)  McGuckin says that that DEA agent told him that DiPonio was "the leader of a violent motorcycle gang in the city of Flint," that DiPonio was recently seen leaving a known "drug house," and that "there was a good possibility [DiPonio] was transporting a large quantity of narcotics." (*Id.*)  The agent also told McGuckin that DiPonio was "known to traffic[] drugs and weapons." (*Id.*)

After McGuckin received that call, DiPonio drove "past the front of [McGuckin's] patrol car." (*Id.*, PageID.415.)  At that time, McGuckin observed, among other things, that (1) DiPonio's front driver and passenger side windows were tinted to such a degree that McGuckin "could not see into the passenger compartment of the vehicle," and (2) one of the bulbs in DiPonio's brake light,[1] which was made up of multiple bulbs, was not working. (*Id.*, PageID.415-419.)  Based on those

---

[1] As described in more detail below, Michigan's Motor Vehicle Code refers to what is commonly-referred to as a "brake light" as a "stop lamp." Mich Comp. Laws § 257.697(a).   At the hearing on McGuckin's summary judgment motion, all parties agreed that the light at issue here was DiPonio's brake light.  For ease of reference in this order, the Court will use the term "brake light" when describing the relevant light on DiPonio's vehicle.

observations, McGuckin initiated a traffic stop.[2]

## B

McGuckin says that after he approached DiPonio's car, he "immediately […] smell[ed] the odor of marijuana" emanating from the vehicle, and he had a "discussion about that" odor with DiPonio. (McGuckin Dep. at 40, ECF No. 38-3, PageID.421.)  McGuckin also says that he "observed in plain view the handle of [a] firearm sitting next to [DiPonio]," and he asked DiPonio if he "had a license for a firearm." (*Id.* at 40-41, PageID.421-422.)  McGuckin insists that DiPonio "could [not] provide" a license or "any paperwork" for the gun. (*Id.*)  But DiPonio did give McGuckin consent to run a computer search to determine whether the firearm was properly registered. (*See id.*; *see also* DiPonio Dep. at 12-13, ECF No. 38-6, PageID.489-490.)

After McGuckin obtained permission to run the registration search, he asked DiPonio to "exit the car" because McGuckin wanted to "get [DiPonio] away from the firearm." (McGuckin Dep. at 42-43, ECF No. 38-3, PageID.423-424.)  Once DiPonio stepped out of the car, McGuckin conducted a pat down and search of DiPonio for weapons. (*See id.* at 53, PageID.434.)  McGuckin says that he

---

[2] DiPonio does not appear to dispute that his windows were tinted.  Nor has he identified any evidence in the record that all of the bulbs in his multi-bulb brake light were working properly at the time he was pulled over.  He insists, however, that neither of basis provided a lawful ground for McGuckin to initiate a traffic stop.

discovered a knife in DiPonio's pocket. (*See id.*)  McGuckin then retrieved the firearm from DiPonio's car.

At that point, McGuckin had his colleagues at the dispatch center run the database search to determine if the firearm in DiPonio's possession was properly registered. (*See id.* at 43, PageID.424.)  That database search indicated that the weapon was "not registered to anybody." (*Id.*)

Finally, McGuckin conducted a physical search of DiPonio's vehicle with his police canine.  During that search, McGuckin discovered suspected narcotics. (*See* Video of Traffic Stop, ECF No. 38-4.)  He then arrested DiPonio.

DiPonio disputes some, but not all, of McGuckin's version of events.  More specifically, DiPonio says that he never spoke with McGuckin about any odor of marijuana coming from his vehicle, that he did provide his concealed pistol license to McGuckin, and that he did not have a knife on his person. (*See* DiPonio Dep. at 12-14, 17, ECF No. 38-6, PageID.489-491, 494.)  However, DiPonio acknowledges that he did give McGuckin consent to run a computer search for the registration of the firearm. (*See id.* at 12-13, PageID.489-490.)

## C

Following DiPonio's arrest, a grand jury in this Court returned a four-Count indictment against him. (*See* Indictment, *United States v. DiPonio*, E.D. Mich. Case No. 19-cr-20739, ECF No. 1.)  The indictment charged DiPonio with three Counts

4

of possession with intent to distribute methamphetamine and one Count of possession of a firearm in furtherance of a drug trafficking crime. (*See id.*)  Count 1 of the Indictment specifically charged DiPonio with possessing the methamphetamine that McGuckin found in DiPonio's vehicle. (*See id.*)   On September 20, 2021, DiPonio pleaded guilty to one Count of possession with intent to distribute methamphetamine pursuant to a Rule 11 Plea Agreement. (*See* Plea Agmt., *id.*, ECF No. 46.)   As part of the factual basis for his plea, DiPonio acknowledged that on the day McGuckin pulled him over, he possessed methamphetamine and a firearm. (*See id.*, PageID.350.)

### D

DiPonio filed this action against McGuckin on June 24, 2021. (*See* Compl., ECF No. 1.)   The operative pleading in this case is DiPonio's First Amended Complaint. (*See* Am. Compl., ECF No. 6.)   In the First Amended Complaint, DiPonio brings the following four claims against McGuckin:

- In Count I, DiPonio says that McGuckin violated the Fourth Amendment when McGuckin initiated a traffic stop despite having "no reasonable, articulable suspicion that a criminal offense had occurred, was occurring, or was about to occur." (*Id.* at ¶ 39, PageID.41.);

- In Count II, DiPonio claims that McGuckin violated the Fourth Amendment when McGuckin "conducted a frisk of [DiPonio]" without "a

reasonable, articulable suspicion that [DiPonio] was armed." (*Id.* at ¶¶ 52, 54, PageID.43.);

- In Count III, DiPonio alleges that McGuckin violated the Fourth Amendment when McGuckin "conducted a search of [DiPonio's] vehicle." (*Id.* at ¶ 65, PageID.45.); and

- Finally, in Count IV, DiPonio says that McGuckin violated the Fourth Amendment when McGuckin falsely arrested DiPonio without probable cause. (*See id.* at ¶ 80, PageID.47.)

McGuckin moved for summary judgment on all of DiPonio's claims on March 4, 2024. (*See* Mot., ECF No. 38.)  In that motion, McGuckin argued that (1) he was entitled to qualified immunity on each of the Counts in DiPonio's First Amended Complaint and (2) DiPonio's claims were barred under the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994).  The Court held a hearing on the motion on July 23, 2024.

## II

Under Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

### III

The Court begins with McGuckin's argument that he is entitled to qualified immunity with respect to each of DiPonio's claims.  The Court agrees.

### A

"Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  "Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the

actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

Once a defendant raises a qualified immunity defense, the "plaintiff bears the burden of showing that [the] defendant is not entitled to qualified immunity." *Jacobs*, 915 F.3d at 1039. "A qualified-immunity inquiry involves two questions: whether defendants violated a constitutional right and whether that right was clearly established." *Brown*, 814 F.3d at 457. "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Id.* With respect to the clearly-established prong of the qualified immunity analysis, a "defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite [such] that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Wenk v. O'Reilly*, 783 F.3d 585, 598 (6th Cir. 2015) (quoting *Plumhoff*, 134 S.Ct. at 2023).

**B**

In Count I of the Amended Complaint, DiPonio claims that McGuckin violated his (DiPonio's) Fourth Amendment rights when McGuckin stopped DiPonio's vehicle and initiated a traffic stop. The Court concludes that McGuckin

8

is entitled to qualified immunity on this claim because it was not clearly established that McGuckin violated the Fourth Amendment when he stopped DiPonio.

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996) (holding that traffic stop was "reasonable under the Fourth Amendment" where "officers had probable cause to believe that petitioners had violated the traffic code"). Thus, "so long as [an] officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1991).

The traffic laws at issue here relate to the proper condition and operation of a vehicle's brake lights. Under Michigan's Motor Vehicle Code, "a person shall not drive [...] a vehicle [... that] is not at all times equipped with lamps and other equipment in proper condition." Mich. Comp. Laws § 257.683(1). As to brake lights specifically, Section 697 of the Motor Vehicle Code requires that all "motor vehicle[s]" be equipped with brake lights "on the rear which shall emit a red or amber light which shall be actuated upon application of [the] foot brake." Mich Comp. Laws § 257.697(a). Importantly, such brake lights "shall at all times be maintained in good working condition." Mich. Comp. Laws § 257.697(b). Finally, police

officers may stop and inspect vehicles and issue traffic citations where "a defect in equipment is found." Mich Comp. Laws § 257.683(2).

Here, McGuckin could reasonably, even if mistakenly, have concluded that he had a lawful basis to stop DiPonio for driving with defective equipment in violation of the Motor Vehicle Code.  More specifically, McGuckin could fairly have believed that DiPonio's brake light was not "maintained in good working condition," as required by Mich. Comp. Laws § 257.697(b), based on his observation that one bulb in DiPonio's multi-bulb brake light was not operating properly.[3]

DiPonio counters that McGuckin could not reasonably have concluded that his brake light was not in "good working condition."  DiPonio highlights that even though a single bulb in that light may not have been working, other bulbs in the same light were working, and light was emanating from the brake light, at least to some degree, when he applied his brakes.  DiPonio therefore insists that it should have been obvious to McGuckin that the brake light was sufficiently performing its function in compliance with Mich. Comp. Laws § 257.697(b).  But DiPonio has not

---

[3] At the hearing on McGuckin's summary judgment motion, DiPonio's counsel candidly admitted that there was no evidence in the record to contradict McGuckin's testimony that not all of the bulbs in DiPonio's brake light were in "good working condition" at the time McGuckin initiated the traffic stop.  For example, DiPonio has not submitted an affidavit or identified any other evidence that all of the bulbs were working properly.

cited any authority from the Michigan appellate courts that would have put McGuckin on notice that a brake light is in "good working condition" where, as here, less than all of its bulbs are operational. Because it was his burden to do identify that authority, and because he failed to do so, DiPonio cannot overcome McGuckin's invocation of qualified immunity.

Moreover, the closest published decision from a Michigan appellate court, *People v. Williams*, 601 N.W.2d 138 (Mich. App. 1999), suggests that McGuckin could reasonably have concluded that DiPonio's brake light was not in compliance with Mich. Comp. Laws § 257.697(b). In *Williams*, "two police officers on patrol in the city of Grand Rapids observed a moving vehicle with an inoperative [taillight] on the passenger's side. The [taillight] on the driver's side was working." *Id.* at 139. The officers believed that the vehicle was being operated in violation of the Motor Vehicle Code because only one of its taillights was working, and they stopped the vehicle on that basis. *Id.* During that stop, the officers found cocaine on the defendant, and he was subsequently charged with possession with intent to deliver less than fifty grams of cocaine. *See id.*

Before the defendant's criminal trial, the defendant moved to suppress the evidence discovered during the stop "on the ground that the initial stop was invalid." *Id.* He argued that his vehicle was in compliance with the Motor Vehicle Code because one of his two taillights was working. *See id.* The Michigan Court of

11

Appeals disagreed. That court concluded that "when multiple [taillights] are included in an automobile's design, they are intended, in part, to function together to enhance safety." *Id.* at 141. The court therefore held that "a motor vehicle equipped with multiple [taillights] is in violation of [the Motor Vehicle Code] if one or more if its tail lamps is inoperative." *Id.*

*Williams* admittedly does not speak to the precise issue before the Court. In *Williams*, the court addressed the operation of a taillight, not a brake light, and the Motor Vehicle Code has separate provisions addressing the two distinct types of lights. Moreover, in *Williams*, one of the defendant's two taillights was completely inoperable; here, the Court addresses a brake light that was partially operable because one of its bulbs was not functioning. But *Williams* would have given McGuckin a reasonable, even if mistaken, basis on which to conclude that DiPonio's brake light was not in compliance with the Motor Vehicle Code. More specifically, McGuckin could reasonably have concluded that all of the bulbs in a single brake light – like all of the separate taillights on a vehicle – are "intended, in part, to function together to enhance safety," and, thus, that a brake light is not in "good working condition" if one of its bulbs is not working. At an absolute minimum, in light of *Williams*, it would not have been clear to McGuckin that DiPonio's brake light *did* comply with the Motor Vehicle Code and that he (McGuckin) could not stop DiPonio based upon the non-functioning bulb in that brake light.

For all of these reasons, McGuckin is entitled to qualified immunity from DiPonio's claim that McGuckin stopped him in violation of the Fourth Amendment.

## C

The Court next turns to DiPonio's claim in Count II of the First Amended Complaint that McGuckin violated the Fourth Amendment when McGuckin conducted a frisk and pat down of DiPonio without a reasonable suspicion to believed he was armed.  McGuckin is also entitled to qualified immunity on this claim.

DiPonio has not shown that McGuckin violated any clearly-established law when he frisked and patted down DiPonio.  "In a pathmarking decision, *Terry v. Ohio*, 392 U.S. 1 (1968), the [Supreme] Court considered whether an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009).  In *Terry*, the Supreme Court "held that a police officer may briefly detain an individual, question him, and perform a limited frisk for weapons if the officer reasonably suspects the individual of criminal activity." *United States v. Chapman*, 305 F.3d 530, 533 (6th Cir. 2002). While under *Terry*, "[a] lawful stop … does not necessarily carry with it the authority to conduct a pat-down search," *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008), an officer who has made such a stop may conduct a pat-down search

13

"upon reasonable suspicion that [a suspect] may be *armed and dangerous*." *Id.* (emphasis in original).

Here, it was reasonable for McGuckin to conclude that DiPonio was armed and dangerous and that a pat down for his safety was therefore lawful.  It is undisputed that prior to the traffic stop, the DEA informed McGuckin that DiPonio was the "leader of a violent motorcycle gang" who was "known to [be] trafficking drugs and weapons." (McGuckin Dep. at 33, ECF No. 38-3, PageID.414.)  More importantly, before McGuckin conducted the pat-down search, McGuckin observed DiPonio in possession of a handgun in his vehicle, and DiPonio also told McGuckin that he was in possession of a knife.

Finally, DiPonio has not identified any factually analogous decisions that would have put McGuckin on notice that conducting a pat-down search under these circumstances would have been unlawful.  DiPonio's failure to cite such authority underscores that McGuckin is entitled to qualified immunity.[4]

For all of these reasons, McGuckin is entitled to qualified immunity on DiPonio's claim in Count II of the First Amended Complaint arising out of the pat-down search.

---

[4] In order to defeat McGuckin's claim of qualified immunity, DiPonio was not required to cite a decision with facts identical to those here. *See*, *e.g.*, *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021).  But he has failed to cite any decision in which any court has found a pat-down search unconstitutional on facts that bear a meaningful resemblance – although they are not identical – to those here.

**D**

Next, in Count III of the First Amended Complaint, DiPonio claims that McGuckin violated the Fourth Amendment when McGuckin conducted a search of his (DiPonio's) vehicle. The Court concludes that McGuckin is entitled to qualified immunity on this claim.

As explained above, McGuckin "immediately smell[ed] the odor of marijuana" when he made contact with DiPonio's vehicle (McGuckin Dep. at 40, ECF No. 38-3, PageID.421), and that odor would have given him probable cause to search DiPonio's car without a warrant. Indeed, at the time of the stop, which happened before Michigan legalized marijuana for recreational use in November 2018, "the smell of marijuana coming from [a] vehicle" provided "probable cause to search the vehicle without a search warrant." *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004). *See also United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008) (citing cases and noting that the Sixth Circuit has "consistently" held "that the detection of a narcotic's odor, by itself, is sufficient to provide probable cause to conduct a lawful search of a vehicle.").

There is no evidence in the record to contradict McGuckin's testimony that he smelled marijuana emanating from DiPonio's vehicle. DiPonio did not testify that there was no such odor, nor did he submit an affidavit to that effect. Instead, DiPonio says only that he never *discussed* the odor of marijuana with McGuckin. (*See*

15

DiPonio Dep. at 14, ECF No. 38-6, PageID.491).[5]  But that does not conflict with McGuckin's testimony that he smelled marijuana.

Simply put, DiPonio has not identified any contradictory evidence that could create a disputed question of fact as to whether McGuckin smelled the odor of marijuana when he approached DiPonio's vehicle.  And based on that odor, it was reasonable for McGuckin to conclude he had a lawful basis to search DiPonio's car.[6]  For all of these reasons, McGuckin is entitled to qualified immunity on DiPonio's claim in Count III of the First Amended Complaint arising out of the search of DiPonio's car.

---

[5] During the stop, DiPonio may also have denied that he was then in possession of any marijuana.  According to McGuckin's incident report, while DiPonio acknowledged during the stop that he was a "medical marijuana care giver," DiPonio denied "hav[ing] any 'medicine' with him." (Incident Rpt., ECF No. 38-2, PageID.378.) However, at DiPonio's deposition, he denied ever discussing the possession or smell of marijuana with McGuckin. (*See* DiPonio Dep. at 14-15, ECF No. 38-6, PageID.491-492.)  Even if DiPonio denied being in possession of marijuana at the time he was pulled over, that would not contradict McGuckin's testimony that he smelled marijuana when he approached DiPonio's vehicle.

[6] At one point in DiPonio's briefing, he appears to suggest that the search of his vehicle was unlawful because McGuckin prolonged the traffic stop to develop facts to support probable cause for the vehicle search. (*See* DiPonio Br., ECF No. 42, PageID.643-644, citing *Rodriguez v. United States*, 575 U.S. 348 (2015)).  To the extent that DiPonio is making this argument, it fails.  McGuckin smelled the marijuana – and thus had probable cause to search DiPonio's vehicle – at the beginning of the stop.  This is not a case in which probable cause was developed during a period of delay following the stop.

**E**

Finally, in Count IV of the First Amended Complaint, DiPonio claims that he was unlawfully arrested.  McGuckin is entitled to qualified immunity on this claim (and the claim fails on the merits) because DiPonio's arrest did not violate his constitutional rights. As explained in detail above, at the time of his arrest, McGuckin had (1) determined that DiPonio possessed an unregistered firearm in violation of Michigan law and (2) discovered suspected narcotics in DiPonio's vehicle.  Those facts provided a lawful basis for McGuckin to arrest DiPonio.

**V**

For all of the reasons explained above, McGuckin is entitled to qualified immunity on all of DiPonio's claims against him.[7]  McGuckin's motion for summary judgment (ECF No. 38) is therefore **GRANTED**.

**IT IS SO ORDERED**.

|  |  |
|---|---|
|  | s/Matthew F. Leitman |
|  | MATTHEW F. LEITMAN |
| Dated:  August 20, 2024 | UNITED STATES DISTRICT JUDGE |

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 20, 2024, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126

---

[7] Because the Court concludes that McGuckin is entitled to qualified immunity, it declines to address McGuckin's alternative argument that he is entitled to summary judgment under the Supreme Court's decision in *Heck v. Humphrey*.